[Cite as *State v. Sanders*, 2019-Ohio-30.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT


| | |
|---|---|
| STATE OF OHIO | JUDGES:<br>Hon. John W. Wise, P. J.<br>Hon. William B. Hoffman, J. |
| Plaintiff-Appellee | Hon. Patricia A. Delaney, J. |
| -vs- | Case No. 2018 CA 00004 |
| ISAIAH SANDERS | |
| Defendant-Appellant | O P I N I O N |


CHARACTER OF PROCEEDING:    Criminal Appeal from the Court of Common
                             Pleas, Case No.  2016 CR 02392


JUDGMENT:                    Affirmed


DATE OF JUDGMENT ENTRY:      January 7, 2019


APPEARANCES:

For Plaintiff-Appellee                For Defendant-Appellant

JOHN D. FERRERO                       BERNARD L. HUNT
PROSECUTING ATTORNEY                  2395 McGinty Road, Nw
KATHLEEN O. TATARSKY                  North Canton, Ohio  44720
ASSISTANT PROSECUTOR
110 Central Plaza South, Suite 510
Canton, Ohio  44702-1413

*Wise, P. J.*

**{¶1}** Appellant Isaiah Sanders appeals his convictions on two counts of murder, two counts of felonious assault, one count of attempted kidnapping and one count of tampering with evidence, following a jury trial in the Stark County Court of Common Pleas.

**{¶2}** Appellee is the State of Ohio.

## STATEMENT OF THE FACTS

**{¶3}** On January 26, 2017, the Stark County Grand Jury indicted Appellant, Isaiah Sanders, on two counts of murder, a violation of R.C. §2903.02(8), two counts of felonious assault, a violation of R.C. §2903.11(A)(2), Attempted Kidnapping, a violation of R.C. §2905.01(A)(2) and tampering with evidence, a violation of R.C. §2921.12(A)(1). The counts contained five firearm specifications

**{¶4}** On November 28, 2017, a jury trial commenced in this matter. Six witnesses testified on behalf of the state. The jury was presented with the following testimony and evidence:

**{¶5}** Appellant Isaiah Sanders had moved to Akron, Ohio from Atlanta, Georgia to live with his aunt, a school teacher. (T. Vol. 2 at 194). He made friends with Eryc Higgins, whom he described as his only friend, his best friend, and his "brother." (T. Vol. 2 at 195). He ended up moving in with Higgins and his sister, Alysen McNabb. (T. Vol. 2 at 195-196).

**{¶6}** In May of 2016, while working for Next to New Appliances, Appellant Isaiah Sanders delivered a used refrigerator to the home of Brooke Clemons' mother. There, he met Clemons and struck up a relationship which would eventually become a romantic relationship. (T. Vol. 2 at 197). Clemons complained to Appellant that the father of her

three young children, Joshua Weatherspoon, was not taking care of her and her children. According to her, he didn't show up when she asked to deliver diapers and cigarettes. (T. Vol. 2 at 217). Clemons wanted Sanders to beat Weatherspoon up as retaliation for his neglectful behavior, but she did not want to be involved. (T. Vol. 2 at 202).

{¶7}    Sanders devised a scheme to teach Weatherspoon a lesson and proposed it to Higgins. (T. Vol. 2 at 203). Clemons would lure Weatherspoon to the home she shared with her three young children by telling him she needed diapers, Sanders and Higgins would be there, kidnap Weatherspoon and take him to a place where they could "whoop" him. (T. Vol. 1 at 213 - videotaped interview of Sanders was played for the jury; T. Vol. 2 at 52-53).

{¶8}    On August 29, 2016, Sanders and Higgins hitched a ride to Canton to the home of Clemons. That night, they went to Walmart. (T. Vol. 2 at 210). They used Clemons' food stamp card to buy Pop-tarts and Pepsi and stole zip-ties and gloves. (T. Vol. 2 at 51, 210-211). The plan was to use the zip-ties to tie up Clemons so she could pretend to be an innocent victim, kidnap Weatherspoon and take him away from the Canton area, "beat him up, leave him there, let him go figure it out." (T. Vol. 1 at 213, T. Vol. 2 at 210-211).

{¶9}    Sanders admitted that he knew there were guns in the Clemons' home left there by Weatherspoon. There was a loaded Beretta M9 on the table in the living room-dining room and another in the closet.

{¶10} On the night of August 29, 2016, Sanders and Higgins waited for Weatherspoon to arrive at Clemons' house but fell asleep sometime after midnight when he failed to show. (T. Vol. 2 at 210-213).

{¶11} Around 5:00 a.m. on August 30, 2016, Sanders woke up to the sound of the muffler from Weatherspoon's Lexus in the driveway of Clemons' home. (T. Vol. 2 at 213). He saw Clemons use the stolen zip-ties to tie her hands up. (T. Vol. 1 at 141, T. Vol. 2 at 214). Things started happening fast. He heard some scuffling and saw that Weatherspoon had Higgins in a chokehold in the kitchen and Weatherspoon's right hand in his pocket. (T. Vol. 2 at 216-218). Sanders went to the closet and grabbed the Beretta from the shelf, pointed the gun at the struggling men and pulled the trigger five times. (T. Vol. 2 at 216, 219-221, 224). Sanders saw the two men fall to the kitchen floor together. (T. Vol. 2 at 221). Sanders went to the body of Higgins and turned him over, checked for a pulse and finding none, knew he was dead. (T. Vol. 2 at 224). Sanders stated that he then took both guns with him and an iPhone and fled the scene. (T. Vol. 2 at 224). He stated that he initially fled to Alabama and then to Atlanta. (T. Vol. 2 at 225).

{¶12} Meanwhile, Clemons ran to the home of the neighbor crying hysterically, with her hands still tied with the zip-ties. The neighbor cut off the zip-ties and accompanied her back to the home while his mother-in-law called 911. (T. Vol. 1 at 141-144).

{¶13} Canton Police Officer David Samuels was working the day shift that day and arrived at the Clemons' home on Midway Avenue around 8:57 a.m. Outside, he saw Clemons and the neighbor talking and tried to find out if there was an active shooter inside. (T. Vol. 1 at 127). Finding at least two small children inside, he chose to not wait for backup. He looked in the front door, holstered his sidearm and removed the children; one in an infant seat and one on the couch. When backup arrived, the officers entered the home, guns drawn, searching for an active shooter. The officers found two bodies next to each other in the kitchen area, dead from gunshot wounds. (T. Vol. 1 at 130).

**{¶14}** Canton City Detective Terry Monter was dispatched to the scene. Joshua Weatherspoon was quickly identified as one of the victims. His Lexus was parked in the driveway. (T. Vol. 1 at 260. A firearm was found in the Lexus, but no firearm was found on the body of Weatherspoon. (T. Vol. 1 at 160). The other deceased male was not known and had no identification on him. A black and white driver's license was found at the scene but the photo was blurry. It contained the name Isaiah Sanders and was issued from Georgia. (T. Vol. 1 at 162).

**{¶15}** Det. Monter made contact with Atlanta police who sent a photo of Sanders. The picture did not match the unidentified deceased male. (T. Vol. 1 at 162). Later, however, Monter was able to learn the name of the unidentified decedent through phone records of Sanders, Akron relatives, and an interview with Clemons, who told Monter she heard the shooter yell, "Eryc, Eryc, No" after the murder. The second male was identified as Eryc Higgins. (T. Vol. 1 at 164). Detectives ultimately learned that Sanders was friends with Higgins.

**{¶16}** By tracing telephone calls, Det. Monter was able to locate Sanders in Atlanta, Georgia. A warrant was issued for Sanders' arrest and in December, 2016, Sanders was picked up in Atlanta and brought to Stark County.

**{¶17}** On December 20, 2016, after being given *Miranda* warnings, Appellant Sanders gave an hour and fifteen minute interview to Det. Monter. The redacted videotaped interview was played for the jury. (T. Vol. 1 at 213). During the interview, Sanders admitted to the killings.

**{¶18}** The body camera of the first responding officer was also played for the jury.

**{¶19}** At the close of the State's case, Appellant made a motion for judgment of acquittal, which was overruled. Appellant then testified on his own behalf.

**{¶20}** Appellant requested jury instructions on Accident, Self-Defense, Defense of another, involuntary manslaughter and voluntary manslaughter. The trial court declined to give any of those instructions finding that the evidence presented did not support them. (T. 2, 18-36, 112).

**{¶21}** Following approximately three hours of deliberations, the jury returned with a verdict of guilty to all of the charges in the indictment.

**{¶22}** At a sentencing hearing held on December 4, 2017, the trial court sentenced Appellant to fifteen (15) years to life for each of the two counts of Murder, with a consecutive three (3) years for each of the related Firearm Specifications. The counts of Felonious Assault together with their related Firearm Specifications were merged with Counts one and two. The trial court also sentenced Appellant to consecutive sentences of seven (7) years for Attempted Kidnapping and an additional twenty-four (24) months for Tampering with Evidence, for a total term of forty-five (45) years to life in prison

**{¶23}** Appellant now appeals, raising the following error for review:

<u>ASSIGNMENTS OF ERROR</u>

**{¶24}** "I. THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY ON THE LESSER OFFENSE OF INVOLUNTARY MANSLAUGHTER AS REQUESTED BY APPELLANT.

**{¶25}** "II. THE TRIAL COURT ERRED BY NOT INSTRUCTING THE JURY ON THE LESSER OFFENSE OF VOLUNTARY MANSLAUGHTER AS REQUESTED BY APPELLANT.

**{¶26}** "III. APPELLANT'S CONVICTION FOR TAMPERING WITH EVIDENCE AS SET FORTH IN COUNT SIX OF THE INDICTMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE.

**{¶27}** "IV. APPELLANT'S CONVICTIONS FOR ATTEMPTED KIDNAPING AS SET FORTH IN COUNT FIVE OF THE INDICTMENT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT SUPPORTED BY SUFFICIENT EVIDENCE."

**I., II.**

**{¶28}** In his first and second assignments of error, Appellant argues the trial court erred in denying his request for instructions on involuntary manslaughter and voluntary manslaughter. We disagree.

**{¶29}** We review a trial court's refusal to provide a requested jury instruction for an abuse of discretion. *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). Generally, "a trial court must fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh evidence and discharge its duty as the fact finder." *State v. Comen*, 50 Ohio St.3d 206, 553 N.E.2d 640 (1990), paragraph two of the syllabus.

**{¶30}** In *State v. Deanda*, the Ohio Supreme Court observed,

The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis. *State v. Evans*, 122 Ohio St.3d 381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. The first tier, also called the "statutory-elements step," is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense. *State v. Kidder*, 32 Ohio St.3d 279,

281, 513 N.E.2d 311 (1987). The second tier looks to the evidence in a particular case and determines whether " 'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.' " *Evans* at ¶ 13, *quoting Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, ¶ 11. Only in the second tier of the analysis do the facts of a particular case become relevant.

**{¶31}** 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6.

**{¶32}** Appellant argues he was entitled to instructions of involuntary manslaughter and voluntary manslaughter as lesser-included offenses of felony murder.

**{¶33}** R.C. §2903.02(B) sets forth the elements of the offense of felony murder and states:

No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.

**{¶34}** The predicate offenses for the murders as charged are felonious assault, to wit, causing physical harm to the victims by means of a firearm, and/or attempted kidnapping.

*Involuntary Manslaughter*

**{¶35}** Involuntary manslaughter under R.C. 2903.04(A), is defined as "no person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony," and is almost identically worded but expands the

definition to include any felony offense instead of limiting the predicate crime to a first or second-degree felony offense of violence. *State v. Brodie,* 165 Ohio App.3d 668, 2006–Ohio–982, 847 N.E.2d 1268, ¶ 26 (2d Dist.).

**{¶36}** Appellant argues that the evidence demonstrated that he did not act knowingly in the killings. He contends that he did not plan or intend to kill Weatherspoon and that he did not knowingly harm Eryc Higgins. Appellant states that rather he "was complicit in the death of another as a proximate result of his committing a felony, felonious assault or an attempted kidnapping, both of which are second degree felonies.

**{¶37}** Here, Appellant has not demonstrated that the predicate offense for the felony murder was anything but a first or second-degree offense of violence, and therefore, Appellant was not entitled to the jury instruction on involuntary manslaughter in this case.

*Voluntary Manslaughter*

**{¶38}** In order to warrant an instruction on voluntary manslaughter, a defendant must present sufficient evidence of serious provocation such that a jury could reasonably acquit the defendant of murder and convict the defendant of voluntary manslaughter. *State v. Newell,* 5th Dist. Licking No. 2004CA00021, 2004–Ohio–6261, ¶ 14, citing *State v. Shane,* 63 Ohio St.3d 630, 637, 590 N.E.2d 212 (1992); *State v. Wilkins,* 64 Ohio St.2d 382, 388, 415 N.E.2d 303 (1980). The defendant must show that he was under the influence of sudden passion or in a sudden fit of rage which was brought about by provocation that was "sufficient to arouse the passions of an ordinary person beyond the power of his or her control." *Id.,* citing *Shane, supra.* "However, past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient

time for cooling off ." *Id., citing State v. Mack,* 82 Ohio St.3d 198, 201, 1998–Ohio–375, 694 N.E.2d 1328 and *State v. Huertas,* 51 Ohio St.3d 22, 31–32, 553 N.E.2d 1058 (1990); *State v. Pierce,* 64 Ohio St.2d 281, 414 N.E.2d 1038 (1980).

**{¶39}** Voluntary manslaughter requires an offender to knowingly cause the death of another while "under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force * * *." R.C. §2903.03(A). Because "its elements are * * * contained within the indicted offense, except for one or more additional mitigating elements [,]" voluntary manslaughter is not a lesser-included offense of murder. *State v. Shane*, 63 Ohio St.3d 630, 632, 590 N.E.2d 272 (1992). Instead, voluntary manslaughter is an inferior degree of murder. *Shane* at 632.

**{¶40}** The analysis of voluntary manslaughter's mitigating element asks first an objective question and second a subjective question. The objective question is whether the victim's provocation was " 'sufficient to arouse the passion of an ordinary person beyond the power of his or her control,' " *Shane* at 635. "or described differently, whether the provocation was 'reasonably sufficient to bring on extreme stress and * * * to incite or arouse the defendant into using deadly force,' " *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988), at paragraph five of the syllabus. The subjective question is "whether this particular defendant was in fact acting under a sudden passion or in a fit of rage." (Citation omitted.) *Id.* We have said that, "[w]hen analyzing the subjective prong of the test, 'evidence supporting the privilege of self-defense, i.e., that the defendant feared for his own personal safety, does not constitute sudden passion or fit of rage.' " *State v. Harding*, 2d Dist. Montgomery No. 24062, 2011-Ohio-2823, ¶ 43, quoting *State v.*

*Stewart*, 10th Dist. Franklin No. 10AP-526, 201[1]-Ohio-466, ¶ 13; *see also State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage.").

{¶41} If insufficient evidence of provocation is presented such that no reasonable jury would decide the actor was reasonably provoked by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction. *State v. Shane,* 63 Ohio St.3d 630, 634, 590 N.E.2d 272 (1992).

{¶42} Upon review, we find that Appellant did not present sufficient evidence of serious provocation in the form of sudden passage or fit of rage for the killings of either Weatherspoon or Higgins. Rather, Appellant testified that he and Higgins had a plan to lure Weatherspoon to Clemons' house to kidnap him and assault him. Appellant also knew two loaded 9 millimeter Beretta handguns were present in the house. When Appellant saw his friend in a physical altercation with Weatherspoon, Appellant went to the closet where he knew the loaded gun was kept, retrieved it and fired it five times at the two men. Appellant admitted that he knew the gun was loaded, and that firing bullets at a person is likely to result in serious physical harm or death to that person. (T. Vol. 2 at 231). Appellant then testified that when the plan went awry and he ended up shooting Weatherspoon and Higgins, those killing were the result of an accident. Appellant testified that he was afraid for his friend and acting on that fear and panic, he retrieved the loaded gun from a nearby closet and fired five times at the men. *See State v. Stargell*, 70 N.E.3d 1126, 2016-Ohio-5653, ¶ 43-44 (2d Dist.) (trial court rejected jury instruction for voluntary manslaughter where the defendant testified that he shot the victim because he was afraid,

not because he was under the influence of a sudden passion or fit of rage); *See Beatty-Jones*, 2d Dist. Montgomery No. 24245, 2011-Ohio-3719, ¶ 23-30 (concluding the same where the defendant's testimony showed that he shot the victims out of fear, not under a sudden passion or in a fit of rage); S*ee also State v. Mack*, 82 Ohio St.3d 198, 201, 694 N.E.2d 1328 (1998) ("Fear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage."). Evidence showing a defendant acted out of fear in a situation does not constitute serious provocation necessary for a jury instruction on voluntary manslaughter. *State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 58 (finding defendant's statement to police that he was "afraid or that he feared for his life" did not constitute evidence that the defendant acted under a sudden passion or fit of rage to support a jury instruction on voluntary manslaughter); *State v. Collier*, 10th Dist. No. 09AP-182, 2010-Ohio-1819, ¶ 17.

**{¶43}** We find that the evidence presented at trial, even viewed in the light most favorable to appellant, would not reasonably support both an acquittal on murder and a conviction for voluntary manslaughter. Considering all the above, under the facts and circumstances of the case, the trial court did not abuse its discretion in declining to instruct the jury on voluntary manslaughter.

**{¶44}** Appellant's first and second assignments of error are overruled.

### III., IV

**{¶45}** In his third and fourth assignments of error, Appellant argues that his convictions for tampering with evidence and attempted kidnapping were against the manifest weight and sufficiency of the evidence. We disagree.

**{¶46}** In determining whether a verdict is against the manifest weight of the evidence, the appellate court acts as a thirteenth juror and "in reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in evidence the jury 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *State v. Thompkins*, 78 Ohio St. 3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541, quoting *State v. Martin*, 20 Ohio App. 3d 172, 175, 485 N.E.2d 717 (1983).

**{¶47}** An appellate court's function when reviewing the sufficiency of the evidence is to determine whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492, paragraph two of the syllabus (1991).

**{¶48}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The jury as the trier of fact was free to accept or reject any and all of the evidence offered by the parties and assess the witness's credibility. "While the trier of fact may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence." *State v. Craig,* 10th Dist. Franklin No. 99AP–739, 1999 WL 29752 (Mar 23, 2000) *citing State v. Nivens*, 10th Dist. Franklin No. 95APA09–1236, 1996 WL 284714 (May 28, 1996). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, 2003 WL 723225, ¶ 21, *citing State v. Antill*, 176 Ohio St.

61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, 10th Dist. Franklin No. 02AP-1238, 2003-Ohio-2889, 2003 WL 21291042, *citing State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (4th Dist. 1992).

**{¶49}** The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger,* 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997).

*Tampering with Evidence*

**{¶50}** Appellant was convicted of tampering with evidence, in violation of R.C. §2921.12(A)(1), which states:

> (A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:

> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;

**{¶51}** Here, evidence was presented that Appellant shot and killed two persons and then fled the scene, taking with him the murder weapon and another firearm. Based on the foregoing facts and evidence, the jury could reasonably find that Appellant took the weapons with him because he knew that an investigation into the killings would be instituted.

*Attempted Kidnapping*

**{¶52}** Appellant was convicted of attempted kidnapping, in violation of R.C. §2905.01(A)(2) , which provides:

(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

\*\*\*

(2) To facilitate the commission of any felony or flight thereafter;

{¶53} Appellant herein raises a *corpus delecti* challenge and argues that the only evidence presented at trial that he attempted to kidnap Weatherspoon was his own testimony at trial and his admissions to Detective Monter prior to trial where he admitting that he had a plan to kidnap Weatherspoon, beat him, and leave him to figure things out because he failed to buy diapers and cigarettes for Clemons.

{¶54} The *corpus delecti* rule was explained by the Ohio Supreme Court in *State v. Maranda*, 94 Ohio St. 364, 114 N.E. 1038 (1916). In *Maranda*, the court stated:

By the '*corpus delecti*' of a crime is meant the body or substance of the crime, included in which are usually two elements: (1) the act; (2) the criminal agency of the act.

It has long been established as a general rule in Ohio that there must be some evidence of a confession, tending to establish the *corpus delicti*, before such confession is admissible. The quantum or weight of such outside or extraneous evidence is not of itself to be equal to proof beyond a reasonable doubt, nor even enough to make it a prima facie case. *Id.* at paragraphs one and two of the syllabus.

**{¶55}** In order to satisfy the *corpus delecti* rule, the prosecution must introduce evidence tending to prove the fact that a crime was committed, but that evidence need not be direct; instead, circumstantial evidence may be relied upon to show *corpus delicti*. *Id.* at 371, 114 N.E. 1038. Indeed, the burden upon the state to provide evidence of the *corpus delecti* is minimal. *State v. Edwards*, 49 Ohio St.2d 31, 36, 358 N.E.2d 1051 (1976).

**{¶56}** Here, the record contains evidence to satisfy the *corpus delecti* rule. Specifically, in addition to Appellant's testimony at trial and his statements to Det. Monter, the State also presented the jury with the Wal-Mart videotape which shows Appellant and Higgins stealing zip-ties and gloves less than 24 hours prior to the killings and failed kidnapping. Unused, partially-closed, zip-ties were also found on the bedroom floor in Clemons' home. Additionally, text message evidence was presented to the jury which supported the plan to lure Weatherspoon to Clemons' house while Appellant was there. (T. Vol. 1 at 188).

**{¶57}** Based on the foregoing, we find appellant's conviction for attempted kidnapping was not against the manifest weight of the evidence. Any rational trier of fact could have found all of the essential elements proven beyond a reasonable doubt. Nor is this the exceptional case in which the evidence weighs heavily against a conviction.

**{¶58}** Appellant's third and fourth assignments of error are overruled.

**{¶59}** For the reasons stated in the foregoing opinion, the judgment of the Court of Common Pleas, Stark County, Ohio, is affirmed.


By: Wise, P. J.

Delaney, J., concurs

Hoffman, J., concurs separately.


JWW/d 1210

*Hoffman, J., concurring*

{¶60} I concur in the majority's analysis and disposition of Appellant's four assignments of error. I write separately with respect to Appellant's first and second assignment of error relating to requesting instructions on lesser included offenses.

{¶61} In addition to the reasons set forth by the majority for overruling said assignments, I note Appellant offered complete defenses to the murder charges; *i.e.,* accident and self-defense, both of which are inconsistent with the requested instructions. Such constitutes an additional reason to overrule Appellant's first and second assignments of error.